

RECEIVED KL

2/2/2021

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COUR

FOR THE NORTHERN DIVISION OF ILLINOIS

EASTERN DIVISION

**21-CV-650**
**Judge Virginia M. Kendall**
**Magistrate Judge Beth W. Jantz**

ERICK B COEMAN

      PLAINFIFF

V

CHICAGO POLICE OFFICERS

      ROBERT MCHALE star# 15902,

In his individual CAPACITY and THE CITY

OF CHICAGO, a municipal Corporation

STATES ATTORNEY OFFICE, THE STATES

ATTORNEY OF COOK COUNTY,

And AGENCY OF STATE OF ILLINOIS,

      DEFENDANTS

Proof of service and notice of filing

To: clerk of court and copy for the Honorable Judge, and

{Opposing counsel & agency} KIMBERLY M. FOX STATES ATTERNOY OF COOK
COUNTY IN OFFICAL CAPACITY AND HER ASSISTING STATES ATORNEYS

3. On August 24, 2018, case# 06CR0757201, was vacated, by Honorable Judge Rains in finding of not guilty.

4. The statute that the Plaintiff was convicted under was held facially unconstitutional, Void ab initio, or void from the beginning.

5. This is a Civil Action for Wrongful Conviction, Unlawful Restraint and Detained, irreparable harm Restricted in travel, Deprived of liberty, Malicious Prosecution, Fabrication of Evidence, Defamation of Character ( libel/Slander) and Excessive Force ,seeking damages against defendants for committing acts under a color of law, and depriving plaintiff of rights secured by the Constitution and laws of the United States. Our nation's founding doctrines provide a bulwark against violations of official power, including abuses by law enforcement. The Constitution and federal and state laws prevent police officers from exploiting their positions of authority to subject Plaintiff to unwarranted physical violence, threats, abuse, and being subjected to intentional Wrongful convictions,

6. The City of Chicago has violated and continues to violate these longstanding canons of fairness and equality. Acting through the CPD, the City of Chicago promotes a culture of rampant Wrongful Conviction, Unlawful Restraint, and Malicious Prosecution, especially against people of color. And Native Americans such as Mr. Coleman.

7. For years and continuing to this day, the City of Chicago has employed a pattern and practice Erick Coleman was convicted of an offense he did not commit and was sentenced to two years of probation, which led to his eventual incarceration of Wrongful Convictions, Unlawful Restraint, Unlawful Detained, and Malicious Prosecution; and years of stalking, harassment that adversely affects all people in Chicago, who are like the Plaintiff  but that disproportionately and intentionally targets Black and Latinx individuals.

8. The CPD's pattern of civil rights violations against people of color is well documented. Between 2005, 2015, and well into 2019 the CPD reported using force, Wrongful Convictions, and false arrest on adults approximately 42,500 times. In 30,736 cases the subject was Black, and in 6,364 cases the subject was Latinx.

9. That means Black people—who make up approximately one-third of the City's population—comprised 72 percent of the cases where adults were subjected to CPD use of Malicious Prosecution over a ten-year period. Whites, who make up a similar portion of the city's population, were just over 9 percent of CPD use of Wrongful Conviction cases.

10. Black men between the ages of 20 and 34 experience Arrest at a rate about 14 times that of their white counterparts. Black women in the same age range are about ten times as likely to experience Arrest as their white counterparts. The CPD does not collect data on individuals who identify as gender non-binary. All CPD data is tracked by reference to men and women.

11. Latinxs are subject to much higher rates of CPD Arrest as well—more than double the rate for whites between 2005 and 2015. From 2013 to 2015, people in predominantly Latinx districts were subject to police Arrest at a rate 20 percent higher than in white-majority districts.

12. Despite these disparities, Black and Latinx complainants rarely receive relief for the abuse they suffer at the hands of the CPD. No reasonable system of police accountability exists, and the system that does exist is discriminatorily applied. Between January 2011 and March 2016, white complainants were three times more likely than Black complainants and six times more likely than Latinx complainants to have their allegations of excessive force, and Wrongful Convictions upheld.

13. The violations and injuries alleged herein have been recognized by the U.S. Department of Justice (the "DOJ"), the Chicago Police Accountability Task Force (the "Task Force"), the federal courts, civil rights activists, City officials—including the Mayor and Superintendent of Police—and, above all, by the communities affected by police violence. Over the years, these official abuses have caused grievous harm to individuals in this City, including the named Plaintiff, his family, and community.

14. The City of Chicago's de facto policies, practices, and customs, which give rise to the violations alleged in this Complaint, have gone unchecked through multiple 5 iterations of municipal leadership, including under former Mayor Richard Daily , former mayor Rahm Emanuel, pass down to former ex Fired police chief Eddie Johnson an is continuing thru the now Mayor Lori Lightfoot.

15. The City continues to pay out tens of millions of taxpayer dollars each year as a result of its pattern and practice of police Wrongful Convictions, Excessive Force, Police Misconduct, and Brutality. The City has proven that it would rather pay for its officers continued use of excessive force than remedy the underlying problems giving rise to the abuses in the first place.

16. Absent federal court supervision, nothing will improve. Internal revisions to the CPD's accountability and operational structures have failed to ameliorate conditions on the ground for those subjected on a daily basis to police abuse. CPD policy changes, implemented over the years and supposedly as recently as May 2017, are superficial changes in name only. Personnel shifts have also failed to correct the systematic deficiencies giving rise to the constitutional violations alleged herein

17. CPD officers abide by an ingrained code of silence and "warrior mentality" wholly disconnected from the policies that exist on the books. The "thin blue line" reigns supreme. The City of Chicago has proven time and time again that it is incapable of ending its own regime of terror, brutality and discriminatory policing.

18. It is clear that Federal court intervention is essential to end the historical and on-going pattern and practice of excessive force by police officers in Chicago.

19. The Plaintiff seeks injunction prohibiting Wrongful Convictions and the abusive policies and practices undergirding the alleged constitutional and state law violations alleged herein.

20. These unconstitutional policies include: the adoption, approval and promotion of a system of discriminatory policing that targets Black and Latinx people who reside in or visit the City of Chicago; the CPD's use of excessive force, and the Practice and Pattern of Wrongful Conviction and charging Functional illiterates of the Law, because they are look at easy prey, particularly against people of color.

21. By a variety of methods, including, striking suspects or detain individuals, Taser use, shootings, vehicular violence, baton use, use of chemical agents, physical harassment during baseless street stops, and hand-to-hand violence such as body slams, emergency take-downs, arm locks, chokeholds, punching, kicking, and slapping; the CPD's use of excessive force and physical harassment targeting youth of color; the CPD's reliance upon overly aggressive tactics that lead to unnecessary escalation and excessive force; the perpetuation of a code of silence and a failure of accountability within the CPD that allows officers to abuse individuals—egregiously, repeatedly—with impunity; the City's failure to train the 12,000 members of the CPD, many of whom regularly use force against residents and visitors of Chicago without proper safeguards; and inadequate municipal data collection systems that impede accountability and transparency in the CPD.

22. Each together results in an overarching pattern of excessive force.

23. This is an civil suit and injunctive civil rights action Complaint filed on behalf of the plaintiff Erick Coleman an all persons in Illinois who, have been, intentional subjected to fraud of wrongful convictions, or in the future will be, subjected to uses of force by the CPD. Plaintiffs also seeks relief in the consistent Unconstitutional violations of untrained litigants who are illiterate in the Law of the Land , ADA violations, and who are functional liberate in the law, and are unaware of there wrongful convictions, because there is no system in play to correct the problem automatically.

24. This lawsuit is brought against the City of Chicago for violations of the Fourth and Fourteenth Amendments of the United States Constitution, pursuant to 42 U.S.C. § 1983, and Illinois state law, including the Illinois Civil Rights Act of 2003, 740 ILCS 23/5.

25. The Plaintiffs individually seek monetary damages against the City of Chicago and individual CPD officer for the harm he has suffered and incurred as a result of the City's policies and practices.

26. The Plaintiff primarily seek declaratory and injunctive relief on behalf of the entire citywide-State of Illinois , who are illegally charged with Void An Initio statutes,  who has and will continue to be convicted of the void ab initio statutes and unconstitutional Aggravated Unlawful Use of weapon (AUUW), so as to put an end, once and for all, to the CPD's practice of subjecting the people of Chicago—especially people of color—to excessive and brutal force, And most importantly Wrongful Convictions that destroys people of color, native Americans such as the Plaintiff. Plaintiff seeks justice for the intentional fraud upon the court by the States Attorney for this Unconditional sentencing scheme.

## JURISDICTION AND VENUE

27. This case arises under the U.S. Constitution and the laws of the United States. The case presents a federal question within this Court's jurisdiction under Article III of the Constitution and 28 U.S.C. § 1331; this Court also has jurisdiction under 28 U.S.C. § 1343(3) to redress the deprivation, under color of state law, of any right, privilege, or immunity secured by the U.S. Constitution. The Court has supplemental 8 jurisdiction under 28 U.S.C. § 1367(a) over claims arising under Illinois state law, including the Illinois Civil Rights Act.

28. Plaintiffs seek remedies under 28 U.S.C. §§ 2201 and 2002, 42 U.S.C. §§ 1983 and 1988, and Rule 65 of the Federal Rules of Civil Procedure. This Court may issue a preliminary injunction pursuant to Fed. R. Civ. P. 65(a). 18.

29. Venue is proper in the United States District Court for the Northern District of Illinois under 28 U.S.C. § 1391(b) as a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this district

## PARTIES

30. Plaintiff, Erick Coleman is a private national state CITIZEN, a natural person, a preamble North NATIVE AMERICAN NATIONAL domiciled on the land in Illinois republic, a Union state.

31. At all times to this complaint defendant, Robert McHale star#15902 was a Chicago Police Officer and was acting within the scope of his employment and under color- of - law. Collectively this individual defendant is referred to as defendant officer.

32. The City of Chicago is a duly incorporated municipal corporation and is the employer and principal of the defendant officer, or employees referred to in this Complaint. At all times material to this Complaint, the defendants Officer was acting under a color of state law, ordinance and/or regulation, statues, and usage of the city of custom and usage of the city of Chicago.

33. The State's Attorney of Cook County, is a duly incorporated corporation, and the state of Illinois and is the employer and principle of the Defendant States Attorney office, or employees referred in this complaint. At all-time material to this Complaint, the defendant States Attorney Office were acting under a color of state law, ordinance and/ or regulation, statues, and usage of the city of custom and usage of the City of Chicago.

34. The State's Attorney Office and Agency of the State of Illinois is a duly incorporated corporation, and the state of Illinois and the is the employer, and principle of the Defendants States Attorney Office, or employees referred in this complaint. At all-time material to Complaint, the Defendant States attorney of Cook County, or employee referred to is this complaint, the Defendant States attorney of Cook County Office were

acting under a color of state law , ordinances and/ or regulation, statues, and usage of the state of Illinois and the city of custom of the city of Chicago and the state of Illinois.

35. The Cook County Board Commission, of the state of Illinois and is the Employer, and principle of the Defendants States Attorney's Office, or Employees referred in this complaint. At all times material to this Complaint the Defendant, Cook County Board Commission were acting under a color of law, ordinances and/or regulation, statues, and language of the state of Illinois and the city of Chicago and the State of Illinois,

## Facts

36. On or about 2006, March 9th, 2006 at or about 96 and Jeffery at the address of 9604, Chicago Illinois, the Defendant Officer were engaged in an unreasonable seizure of the Plaintiff, Specifically, the defendant OFFICER drew this weapon on the Plaintiff and put a loaded pistol to the plaintiffs head. Despite the fact the Plaintiff had not committed a crime, was not the suspected of committing a crime, had not resisted arrest, threatened the DEFENDANT OFFICER, and was not a threat to the DEFENDANT OFFICER.THIS CONDUCT VIOLATED THE FOURTH Amendment to the United States Constitution.

37. Mr. Coleman was arrested on March 9th, 2006 in the Jeffery Manor neighborhood on the southside of Chicago, a location that was heavily policed by corrupt Chicago police officers. The Defendant officer extorted, robbed the plaintiff, and planted drugs, guns on Mr. Coleman he did not possess. Plaintiff was handcuff and subjected to unnecessary and unnecessary use for force. After he dialed 911, in fear that his life was in danger, while Defendant was breaking into the Plaintiff house where he lived at the time with his family.

38. Plaintiff in no way consented to this conduct Plaintiff call and explained to the 911 operator that he need help, because he was in fear for his life was in Danger and, McHale was breaking into his home, and was threatening to put guns and drugs on him. (Subpoena Tape RBHM223331), This is a Fact, not conclusions but factual allegations, The Fact of the matter, without argument Mr. Coleman was the victim.

39. This was done without a warrant or Probable cause

40. Plaintiff in no way consented to this conduct

41. Mr. Coleman had not done anything illegal. Nor was any violation done to the City of Chicago, Illinois, the State of Illinois or the United states of America.

42. On the way to the station and at the station, Defendant McHale and  Unknown Sergeant Explained to Mr. Coleman clearly, that they were looking for two High Profile Suspects, and it was very important that they find them, and the verbally threatening Mr. Coleman that he knew them.

43. Mr Coleman did not know the suspects, and is not an "informant'', Nor a "snitch", knowing that telling  is a deadly code on the streets of (Chicago, does) not tolerate and has led to 1000s of deaths,  A Code of Reputed Silence By the CPD and throughout law enforcement that CPD officers has act as Under cover agents, action as gang members

in the war against gangs and Blacks, Defendant Mchale knowing, that will more likely put his life and family in grave danger, possibility, being retaliated against.

44. Furthermore, Defendant officers continued to interrogate the Plaintiff, without council, when Defendants, suggested and directed Mr. Coleman to get into an altercation with the suspect that Defendant Officers was looking for, and the get rid of them, For example Defendant officer McHale used his trigger finger as he explained to Mr. Coleman, to kill them verbally also.

45. The Defendant Officers, in exchange, verbally explained they would, drop two cases against Mr. Coleman, if he cooperated. Mr. Coleman in no way consented to this conduct, nor is an informant and was very scared. And is still in fear for his life is in danger. Due to retaliation arrest, stalking threats by Defendant Mchale, and Consistent CPD harassment,

46. The Defendants, threatened the Plaintiff at the station, with the effect of harassing words telling him he would get 15 years in jail for his arrest, plus additional 6 years for his case with Officer Tammie Matthews, and Padilla ,in which he was going to trial for at the time of Arrest, and who were also at the station of the night he was arrest demanding that he tell the whereabouts of the suspects, that He did not now.

47. This was retaliatory arrest, by the defendants for numerous Complaints to Ops, and civil suits against fellow officers. In which McHale verbally, told Mr. Coleman "we are the Police, u can't call the Police on the Police" and the only way to get out of this situation is to corporate"

48. At the station, Defendants McHale illegally searched Plaintiff body. Resulting in sexual assault, by touching this private parts and looking for drugs up his Anis, by force and inappropriate threats and threats. Mr. Coleman did not consent to this conduct in no way. Defendant Robert McHale and the other Defendants framed Mr. Coleman for drug crimes and gun offences.

49. Defendants McHale and former States Attorney worked together to create a false and fabricated police report about Mr. Coleman alleged possession of controlled substances and possession of a firearms. An procced to charging instrument. In which is a fact. Because he was arrested and charged. Mr. Coleman did not consent to this conduct.

50. The report listed Defendant McHale as the arresting officer. And Unknown Defendants.

51. As a result of that false arrest and wrongful prosecution, wrongful conviction, Mr. Coleman spent considerable time awaiting trial. Irreparable harm by being convicted by a statue deemed void ab initio, and unconstitutional.

52. During trial Defendant Officer McHale, continued to stalk and violently harass Mr. Coleman, while trial was going on. In one run in with McHale, he threatens to kill Mr. Coleman about the March 9th, 2006 arrest, for OPS Complaints. The Fact of the Matter is Mr. Coleman had properly complained about the threats to his life, to OPS, till this day the CPD has internal Affairs complaint # 313-141 and numerous pf complaints against McHale that have been, swept under the table, even more questioning covered by the City of Chicago police department, and states attorney office.

53. Mr. Coleman is Prosecuted and Convicted under Duress. Plaintiff was Forced against his will. Nor did he consent to this conduct or nor willing. Plaintiff conviction was forced upon him under Duress by the Defendants.

54. On the basis of false reports that the Defendant Officers prepared, Mr. Coleman was prosecuted for drug crimes, of AGGRAVATED UNLAWFUL USE OF A WEAPON (AUUW). Defendants knowingly caused and charged Mr. Coleman Lacked Probable cause for an FIOD Card Violation where the firearms Statute the officer's Justification for his arrest and search Had subsequently Been Declared Unconstitutional and Thus was Void Ab Initio. Upon information an belief and factual documents, CPD officers are none to plant drugs on suspects an fabricate false Arrest reports. In which is a Fact, do to disgrace ex CPD officer Jon Burge and corrupt ex Sgt Ronald Watts.

55. Given such risks, when the State offered him a plea deal, Mr. Coleman took it, in fear of his life, and was coerced into a guilty plea against his will. Mr. Coleman also pled guilty, not because he was actually guilty, but because he was also afraid of how much prison time he could face if he continued to trail.

56. Mr. Coleman was sentenced to two years' probation, including a year of intensive probation, and also served time in jail as a result of his false arrest.

57. Defendant Officers never disclosed to the prosecutors that they had fabricated evidence and falsified a police report related to Mr. Coleman arrest.

58. Defendant Officers never disclosed to the prosecutors any of their misconduct described herein. Nor did the States Attorney. In which it is his or her duty to protect the rights of Mr. Coleman. The Fact is that Defendants Turned A Blinding eye, while on duty and under a color of law.

59. The prosecutors had known that Defendant Officer fabricated evidence, lied under oath, and committed the other misconduct described herein, but still pursued the prosecution of Mr. Coleman, and his unlawful deprivation of liberty would not have been continued.

60. The prosecutors were aware of the, numerous OPS complaints, stalking, consistent harassment, and the FBI investigation into Defendant Officer McHale and the 5th and 4th district Chicago police station..

61. Given that the entirety of the State's case against Mr. Coleman rested on Defendant Officers' fabrication of evidence and the credibility of Defendant Officers, the exculpatory evidence would have been material to Mr. Coleman defense of his criminal charges.

62. The type of encounter this Defendant Police Officer had with Mr. Coleman was unfortunately quite common, and the consequences were dire: a false accusation, criminal proceedings, incarceration, and subsequent felony record.

63. Even though Mr. Coleman was innocent, he risked significant time in prison if he went to trial and lost. Mr. Coleman pled guilty, because he was coerced, forced into, not because he was guilty, but because he was afraid, in fear for his life against Defendant Robert McHale and of how much prison time he could face if he continued to trial.

64. Realizing that a court would not find his allegations to be believable, an the Fact OPS, Internal Affairs covered up case # 313-141 and refuse properly investigate his complaints against Defendant Officer McHale, and due to numerous threats on his life, and consistent harassment, stalking by the Officer and his co-workers, Mr. Coleman was coerced and forced against his will in to a pled guilty and was convicted, in case # 06CR0757201. Defendants turned a blinding eye. Upon belief this was done in relation. And for City of Chicago financial gain. In which is a Fact because the Law remains to this day.

65. On August 24 2018 after Plaintiff himself Pro Per filed a motion to vacate void conviction/Judgement in case# 06CR0757201, and it was vacated by the honorable Judge rains in room 109, at the Bridgeview courthouse, in finding of not guilty.

66. Upon information and belief, when a statue is held unconstitutional in its entirely, it is void ab initio. An unconstitutional law confers no right, imposes no duty, and affords no protection. Therefore, where a statue is violative of constitutional guarantees, a reviewing court has a duty to declare such a legislative act void, but also correct the wrongs.

67. The plaintiff has suffered irreparable harm, because of this conviction due to being unjustly persecuted, subjecting him to consistent harassment, which caused him to be targeted by police because of this unconstitutional, wrongful conviction, which has caused irreparable harm.

68. The Fact of the matter the Defendant States Attorney in his or her official capacity and her assistant state's attorney is the representative of all of the People including the defendants, and it is as his or her duty to safeguard the constitutional rights of the defendant, as those of any other citizen. People V Cochran, 313, ILL 50, 526 (1924). On March 9th, 2006 Plaintiffs rights were violated by the state and Defendants.

69. In no way did or does the Plaintiff consent to this conduct.

70. There is no system in play that, notifies victims of prosecutorial misconduct, Plaintiffs like Mr. Coleman has suffered from. For Example, some victims of this injustice, will never find out because they are functional illiterate, in the Law. They are, look at as easy prey, because of their skin color as targets of being incapable to defend themselves. Some victims never find out or find out years later, after the violations are irreparable because they have suffered irreparable harm.

71. By the plaintiff being unconstitutional an unjustly persecuted. As so in also being subjected to an disparate sentencing scheme. This facilitates, Fraud and the cover up by the state's attorney unconstitutional persecution. The term "Fraud" upon a tribunal or fraud upon the Court 'contemplates conduct so egregious that it undermines the integrity of the judicial process see Stone V Stone, 647, p, 2d, 582 n.& (Alaska 1982).

72. The Illinois Supreme court has broadly defined fraud as any conduct calculated to deceived. See.e.g. In re Amendment (1993) 99.ll. 2d 242, 242,457 N.E 2d 1262,1266,75 IL. D 703.

73. The defendant States attorney has no authority, discretion or otherwise, to charge the offence. People V, Lewis, 175 ILL .2d 412,423,677 N.E 2d 830 (1996); People V Lewis, 149 ILL. 201, 218-20,595 N.E 2d 540 (1992).

74. The fact of the matter is that the statue Mr. Coleman was convicted under was held unconstitutional:

1. His acts charged in the indictment of which he was convicted and for which he was detained / incarcerated did not constitute a Felony or Misdemeanor against the state because the charge was based on a statue later held unconstitutional: and

2. He did not intentionally cause of bring about his conviction because the statue that criminalized Colemans actions is void ab initio, and therefore, his actions for which he was charged, convicted, detained incarcerated were not a crime at the time

3. An unconstitutional statute does not become constitutional, because it can be applied to a certain group of people, and therefore is not a law and is enforceable.

   FOR EXAMPLE: For some of the best legal language on this point, see Judge Posner: "If police officers have been instrumental in the plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates to confine or prosecute him. They cannot hide behind the officials whom they have defrauded." Jones v. City of Chicago, 856 F.2d 985, 994 (7th Cir. 1988) (jury could find that defendants systematically concealed from prosecutors, and misrepresented to them, facts highly material to decision whether to prosecute).

   By reason of the above-described acts and omissions of Defendants acts and omissions of the Defendants, Plaintiff physical injuries, humiliation, and indignities, and suffered great physical, mental, abuse and emotional pain and suffering all to his damages in an amount to be ascertained.

   By aforementioned acts of the defendants were willful, wanton, malicious, oppressive and done with reckless indifference to and/or callous disregard for Plaintiff's rights and justify the awarding of exemplary and punitive damages in an amount to be ascertained according to proof at trial, or any other provision set by law. An any un none damages, un none to the plaintiff.

## <u>Defendant Officers Fabricate a Gun and Drug case</u>

75. The Defendant officer practice a pattern of harassment continued with Mr. Coleman.

76. Sometime in early 2006 and on March 9, 2006, McHale had detained Mr. Coleman. McHale demanded that Mr. Coleman in exchange for his freedom, an in case # 06CR0757201, if Mr. Coleman would tell the whereabouts, of two suspects Defendant McHale was looking for, and Murder the two suspects. That he Defendant Officer was looking for, in exchange he would drop Mr. Coleman criminal cases and straighten everything out. McHale let Mr. Coleman go that time but made clear that Mr. Coleman would have to pay the price if he did not cooperate.

77. Again Plaintiff Mr. Coleman, file an OPS, based on McHale's actions and fearing that his life was in danger. Nothing was done but a cover up. The OPS, Officers and Internal Affairs Investigator in case # 313-141 Would Then Tell Defendant Police Officer McHale, which resulted in Mr. Coleman, being Shot at by informants that work for McHale and Consistent harassment, stalking, and retaliation arrest.

78. The City of Chicago, Through the Chicago Police Department, employs a Code of Silence, Sanctioning and Perpetuating its Officers' Excessive Use of Force, and false arrest:

1. CPD Officers Abide by a Code of Silence.

2.The CPD maintains and promotes a "code of silence" by which police officers are trained and required to lie or remain silent about police misconduct, including the use of excessive force and discriminatory policing. Any officer who violates this code is penalized by the CPD.

3. The code of silence is not a passive function of employment but a deliberate effort on the part of the City leadership and CPD officials to cover up the misconduct of other officers, in violation of CPD policy. CPD Rule 14 prohibits officers from making false statements, but this rule is rarely enforced. Instead, officers know not to intervene in the face of deliberate police misconduct, including excessive uses of force, as detailed herein.

4. Police officers are educated at the CPD about the tenets of this code of silence. They are instructed: "[W]e do not break the code of silence. Blue is Blue. You stick together. If something occurs on the street that you don't think is proper, you go with the flow. And after that situation, if you have an issue with that officer or what happened, you can confront them. If you don't feel comfortable working with them anymore, you can go to the watch commander and request a new partner. But you never break the code of silence."

5.In Obrycka v. City of Chicago et al., No. 07-cv-2372 (N.D. Ill.), a federal jury found that, as of February 2007, the City of Chicago "had a widespread custom and/or practice of failing to investigate and/or discipline its officers and/or code of silence."

6. Years later, nothing has changed. On December 2015, in a speech to Chicago aldermen, ex-Mayor Emanuel acknowledged that Chicago Police use a "code of silence" to conceal abuses and wrongdoing by their colleagues.

7. In December 2016, then-president of the police union, Dean Angelo, stated in an interview with the media that "there's a code of silence everywhere, everybody has it…so why would [the Chicago Police] be any different?"

8. In April 2016, the Task Force found that the code of silence is "institutionalized and reinforced by CPD rules and policies that are also baked into the labor agreements between the various police unions and the City."

9. In May 2016, in a whistleblower lawsuit filed by CPD officers stemming from corruption in the CPD Narcotics Unit, including by CPD Sergeant Watts, lawyers for the City admitted that Chicago Police observe a "code of silence,"

10. The DOJ investigation confirmed that the code of silence pervades the CPD: "City, police officers and leadership within CPD and its police officer union acknowledge that a code of silence among Chicago police officers exists, extending to lying and affirmative efforts to conceal evidence."

11. One CPD sergeant informed DOJ 61 investigators that { "if someone comes forward as a whistleblower in the Department,( they are dead on the street." ) The code of silence extends, as the DOJ found, to sergeants and other supervisors who take affirmative actions to cover up the misconduct of their subordinates.

12. The DOJ determined that the code is "strong enough to incite officers to lie even when they have little to lose by telling the truth." This is because "officers do not believe there is much to lose by lying." 2. The City of Chicago Fails to Discipline, Supervise, and Monitor its Officers, which Contributes to the Code of Silence.

13. The CPD maintains a policy, practice, and custom of failing to discipline, supervise, monitor, and control its officers, including the Defendant Officers. Consequently, the City allows its officers to believe they can abuse and violate the rights of individuals without consequence. These policies, practices, and customs directly contribute to the code of silence.

**Specifically, the City of Chicago knowingly, deliberately, and recklessly fails:**

79. to devise and impart meaningful and consistent discipline for officers who violate the constitutional rights of others, including by allowing for reduced punishment via mediation, arbitration, and other channels of review;

80. to properly investigate allegations of misconduct against officers, including by not investigating complaints unless the complainant meets onerous requirements, not investigating certain types of misconduct entirely, and permitting behaviors that corrupt the fact-finding process of the investigation;

81. to investigate and discipline individual and groups of officers who have engaged in patterns of abuse and brutality; and d. to adequately track complaints against CPD

officers to identify patterns within the CPD, repeat offending officers, or additional measures that are needed to prevent constitutional violations by CPD officers.

82. Instead, the City conducts biased investigations into police misconduct that are designed to insulate officers from discipline. . As a result of the CPD's wholesale failure of accountability, few complaints get sustained overall—only 1.4 percent of all closed complaints from January 2011 through March 2016. Am continues to this very day.

83. The DOJ found that in the five years preceding its investigation, less than 2 percent of the 30,000 total complaints of police misconduct were sustained.

84. The number of sustained complaints is even smaller for complaints brought by people of color. Between 2011 and 2016, only 1 percent of misconduct 63 complaints filed by Black individuals and 1.4 percent of complaints filed by Latinxs resulted in at least one allegation being sustained, while 2.7 percent of complaints filed by whites resulted in at least one allegation being sustained. Thus, complaints filed by white individuals were two-and-a-half times more likely to be sustained than complaints filed by Black individuals, and nearly two times more likely to be sustained than complaints filed by Latinxs.

85. The contrast is even more stark for complaints relating to excessive force. Two percent of all allegations of excessive force involving Black complainants and only 1 percent of such allegations brought by Latinx complainants were sustained, as compared to 6 percent of allegations of excessive force involving white complainants. Thus, white complainants were three times more likely than Black complainants to have their allegations of excessive force upheld, and six times more likely than Latinx complainants.

86. The DOJ reported that in the rare instance where a complaint of misconduct was sustained, "discipline is haphazard and unpredictable, and is meted out in a way that does little to deter misconduct."

87. For instance, even when officer discipline is initially recommended, the findings are often overturned. In 2015, according to the Task Force Report, arbitrators reduced disciplinary recommendations in 56.4 percent of cases and eliminated 64 discipline in 16.1 percent of cases. In total, arbitrators reduced or eliminated discipline in 73 percent of cases.

88. Given the systematic lack of discipline, CPD officers are allowed to amass dozens of complaints without penalty. From 2007 to 2015, more than 1,500 CPD officers acquired ten or more Complaint Registers ("CRs"). Sixty-five of these officers had 30 or more CRs. These numbers do not reflect the entire disciplinary history (e.g., pre-2007) of these officers. They also underreport the problem. While the CPD collects data on officer performance, including complaints and lawsuits, data is often incomplete, and analysis is limited.

89. The CPD's formal early intervention programs, Behavioral Intervention System and Personnel Concerns, which the Department claims are designed to identify and address problematic or abusive officer behavior, are rarely used. The number of officers involved in these programs dropped from 276 in 2007 to zero in 2013. In 2015, only 13 officers

were enrolled. The City employs officers who have accumulated more than 50 misconduct complaints but who have never been enrolled in any of the CPD's "early" intervention programs.

90. The CPD reporting policies and practices further undermine accountability for uses of force. CPD policy outlines the types of use of force incidents that require the completion of a Tactical Response Report ("TRR"). Theoretically, 65 officers are supposed to enter information in a TRR justifying the use of force to superiors. In practice, officers provide little information about uses of force in these reports, and almost none of the detail necessary to evaluate whether the use was appropriate. The TRR format further encourages the use of boilerplate language by abusive officers, as described below.

91. TRRs are systematically approved by supervisors without meaningful review. Although CPD policy requires a supervisor to respond to the scene and conduct investigations of every use of force, including non-shooting uses of force, the DOJ found that supervisors rarely do so.

92. Sergeants reviewing instances of use of force are not required to investigate whether the force used in a given situation was reasonable or lawful or whether policies, equipment, or training could be modified or augmented to prevent future uses of force.

93. Supervisors are not held accountable for failures to report the misconduct of their subordinates. As a result, supervisors regularly refuse to accept complaints of officer misconduct reported by community members. CPD supervisors themselves also consistently fail to submit the required paperwork relating to use of force incidents.

94. Unsurprisingly, as a result of this failed system, a CPD supervisor never found an officer's use of force unjustified in any of the thousands of use of force reports submitted between 2005 and 2015.

95. Given the lack of effective review or discipline, officers often use the same or similar language to justify their use of force. As the DOJ determined: "We saw many instances where officers justified force based on a boilerplate description of resistance that provides insufficient specificity to understand the force used or resistance encountered." The CPD regularly accepts such insufficient documentation without question, even when an officer's use of force is suspect or gives rise to a formal complaint.

96. Overall, the boilerplate reports and omissions in required paperwork and utter lack of supervisor investigation pertaining to officer uses of force result from the City's failure to provide adequate discipline, supervision, and oversight within the CPD.

97. The City's police accountability structures further contribute to the CPD's code of silence.

98. The CPD has a multi-tiered system for reviewing misconduct allegations. IPRA, which is formally external to the CPD, serves as the intake agency for all complaints of police misconduct. IPRA is led by a chief administrator, who is appointed 67 by the mayor and confirmed by City Council. IPRA's budget is also set by City Council. The agency only has jurisdiction to investigate certain types of misconduct, including allegations of excessive force, domestic violence, biased-based verbal abuse, coercion, weapons

discharges, and deaths in custody. Thus, IPRA handles roughly 30% of officer complaints. The majority are referred to CPD's Bureau of Internal Affairs ("BIA"), which handles investigations related to officer-involved criminal conduct and various rule violations. BIA assigns some misconduct complaints to district commanders for investigation. Chicago also has a Police Board made up of nine private citizens appointed by the Mayor with the City Council's consent. The Police Board is not an investigatory body but finalizes CPD disciplinary decisions both by presiding over evidentiary hearings and resolving discipline disputes between IPRA and the Superintendent.

99. Police misconduct investigations by IPRA and BIA investigators serve to legitimate police abuse and immunize officers from disciplinary action, while offering the pretense that police misconduct is being investigated by the City. Despite their knowledge of the widespread operation of the code of silence in the CPD, neither BIA nor IPRA effectively disciplines officers who conceal the misconduct of other CPD employees.

DOJ investigation determined that "IPRA and BIA treat such efforts to hide evidence as ancillary and unexceptional misconduct, and often do not investigate it, causing officers to believe there is not much to lose if they lie to cover up misconduct." In this vein, investigators "employ a higher standard to sustain claims against officers for making false statements . . . and they rarely expand their investigations to charge accused and witness officers with lying to cover up misconduct."

These agencies also systematically fail to collect all available evidence in investigations or to determine whether officers' stories match the evidence. Investigators do not review investigative records to ascertain whether officers who are witnesses to potential misconduct have lied in police reports or whether supervisors have approved reports without ensuring their veracity. ●●. From 2011 to 2016, only 98 Rule 14 charges were sustained against officers. In only one of those cases did IPRA initiate Rule 14 charges against an officer who had witnessed and was concealing another officer's misconduct.

100. The Laquan McDonald case is emblematic of BIA's and IPRA's willingness to ignore Rule 14 violations. Neither BIA nor IPRA pursued Rule 14 charges against any of the officers who witnessed the shooting and wrote reports that were inconsistent with what actually happened.

101. The City has also failed to take appropriate corrective measures or disciplinary action against CPD officers who intimidate potential complainants and witnesses. This includes a refusal to investigate officers who file false assault and battery charges against the victims of, and witnesses to, police abuse.

102. Further eroding transparency in use of force investigations, the City of Chicago has failed to take sufficient corrective and disciplinary action to ensure that CPD officers do not tamper with dash- or body-cameras to conceal video and audio evidence of police misconduct. According to a January 2016 CPD report, in 80 percent of the CPD's dash-cameras, the audio functionality either failed to work or had been tampered with. Officers were found to have regularly damaged antennae, hidden microphones in squad car glove compartments, or removed microphone batteries. Yet investigators rarely investigate these incidents, and the CPD lacks any policy directly providing that officers who intentionally fail to use their body-cameras will be subject to discipline.

103.The Chicago Police Board, too, advances the code of silence and ensures the inadequate discipline of CPD officers. In certain cases—including those in which the Superintendent has recommended termination of an officer, suspension of over one year, or suspension of a supervisor for over 30 days—the Police Board is responsible for 70 reviewing and determining discipline. But the Police Board's review suffers from various structural deficiencies, including: a. the Board's reliance on a convoluted hearing process in which officers conduct hearings and subsequently provide the Board with a second-hand record of the hearing; b. the prohibition against the Board's access to an accused officer's complete complaint and disciplinary file, notwithstanding the fact it is permitted full access to the officer's "complimentary" history; c. the City's failure to provide sufficient training for Board members and hearing officers; and d. the poor quality and untimely nature of the cases brought before the Board due to deficiencies in the underlying investigations.

104. The Police Board's structural deficiencies have exacerbated the City's failure to hold officers accountable for misconduct and have thereby contributed to the CPD's systematic use of unreasonable force. Even absent these systemic deficiencies, the scope of the Board's review does not include the countless cases in which officers were incorrectly determined not to have committed the alleged misconduct and, accordingly, fails to address the broader defects in the City's monitoring and discipline processes.

105. Recent changes to the City's accountability structures do not address the pattern and practice of constitutional violations alleged herein.

106.In October 2016, the City passed an ordinance to replace IPRA with what it now calls the Civilian Office of Police Accountability (COPA). But COPA, like IPRA before it, lacks independence from City Hall. The mayor controls the selection, appointment, and removal of the agency's chief administrator. COPA requires City approval to retain outside counsel. COPA's jurisdiction, while expanded from that of IPRA, does not include serious issues of police misconduct, including the ability to investigate allegations of sexual assault by police officers.

107. The DOJ found that the City's proposed reforms, including COPA, did "not sufficiently address many of the problems we discovered in the City's deeply flawed investigative system." COPA's serious flaws include but are not limited to: a deep uncertainty over whether the proposed budget will support existing investigative duties and the agency's expanded obligations, reliance on mediation for many serious cases, and a lack of independence despite structural reforms.

108.  Most importantly, because none of the reforms address the flawed culture of accountability observed under IPRA, "COPA's expanded investigative authority simply exacerbates these investigative problems."

109. The DOJ concluded that the City had to implement "more than a name change to repair the broken trust that surrounds this investigative agency, particularly since most residents remember the last time the City employed this same rebranding strategy eight years ago when it replaced OPS with IPRA . . . . [T]he systemic and entrenched nature of the deficiencies we identified cannot be remedied by these reforms alone." 3. The City Maintains Specific Investigative Policies and Practices Under Which Officers Know They Can Commit Misconduct with Impunity.

110. Consistent with its flawed disciplinary practices described above, the City maintains a set of investigative policies that allow officers to perpetrate excessive force with impunity. In this way, the City has ratified the code of silence.

111. The City of Chicago impedes the investigation of police misconduct by requiring affidavits in support of complaints, prohibiting anonymous complaints, and requiring that the name of the complainant be disclosed to the accused officer early in the process. As the DOJ found, "given the code of silence within CPD and a potential fear of retaliation, there are valid reasons a complainant may seek to report police misconduct anonymously, particularly if the complainant is a fellow officer."

112. City policy allows CPD officers to wait 24 hours before making a statement on a shooting, so that officers can have private, unrecorded conversations 73 with fellow officers, police leadership, and union staff in the interim between the use of force and reporting process. The DOJ called this procedure "highly troubling," for "[i]f false or mistaken narratives justifying shootings are created during these private conversations and advanced in reports and officer statements, it is exceedingly difficult for even well-trained and diligent investigators to accurately evaluate whether the shooting was justified."

113. The DOJ confirmed that "[t]he possibility of officer collusion in this setting is more than theoretical," citing documented incidents of officer collusion in the 2014 Laquan McDonald shooting as well as in the 2016 shooting of Paul O'Neal. In the O'Neal shooting, not only were rank and file officers recorded confirming with each other that they all had the same perception of the event, but a CPD command official was also recorded condoning the behavior.

114. Under City policy, investigators are prohibited from bringing Rule 14 charges based on a video unless an officer is allowed to view the video first and amend any false or inconsistent prior statements, even if these amendments materially change the officer's prior statements.

115. The City, as a matter of policy, will not investigate police misconduct incidents that before more than five years old, absent authorization from the Superintendent. This ban on investigation of older incidents of misconduct applies even 74 to incidents that include serious misconduct or that may establish a pattern of misconduct. The DOJ found this practice particularly problematic given that "CPD's culture and code of silence…prevent disclosure of serious misconduct in a timely fashion." As a matter of policy, the City also destroys most evidence of police misconduct after five years. This document destruction provision prevents the CPD from monitoring and tracking historical patterns of officer misconduct.

116. As a result of these entrenched tenets of protectionism, officers know they will face neither sanction nor discipline for their own misconduct or for concealing the misconduct of others. As evidence of this, in the five-year period prior to the DOJ investigation, the City investigated 409 police shootings and found only two were unjustified.

117. In sum, the police code of silence—recognized by the federal government, the Task Force, the mayor, a federal jury, and many police officers—was the driving force behind much of the misconduct alleged in this Complaint. That code facilitated, encouraged, and enabled the Defendant Officers to engage in abusive conduct without

discipline or intervention. They knew other officers would cover for them when they physically abused the Plaintiffs. They also knew they would not be subject to discipline for failing to report the misconduct of their colleagues.

118. The DOJ determined that the lack of meaningful investigation into the majority of force incidents has "helped create a culture in which officers expect to use force and not be questioned about the need for or propriety of that use. In this way, CPD's failure to adequately review officer use of force on a regular basis has combined with CPD's failure to properly train and supervise officers to perpetuate a pattern of unlawful use of force within CPD."

119. As a direct and proximate result of the CPD's code of silence, and inadequate disciplinary, monitoring and supervisory structure, and the City's failure to address these obvious shortfalls, CPD officers, including the Defendant Officers, have violated and continue to violate the constitutional rights of those they are sworn to protect. The City Fails to Adequately Train Chicago Police Department Officers.

120. At all relevant times, the CPD, as a matter of policy, practice and custom, fails to adequately train its officers, including the Defendant Officers. This deliberate lack of training on the use of force has resulted in the wholly foreseeable and widespread violation of people's rights, including the rights of the Plaintiff class. It has also resulted in the perpetuation of physical harm to individuals who have suffered electrocution, broken bones, cuts, bruises, and even death, due to the City's failings.

121. The CPD's Education and Training Division provides peace officer training for all law enforcement agencies in Illinois. Consequently, the systemic deficiencies outlined here are replicated in training programs of police officers across the State. 169. The DOJ investigation found that the CPD does not provide officers with appropriate direction, supervision, or support to ensure that policing is lawful and effective. This failure to train pervades all aspects of CPD training, from training of recruits at the Academy and in the field to in-service training for experienced officers.

122. Of particularly relevance to the violations alleged here, the CPD has failed to institute training to address the racial bias that permeates the CPD and influences the decision-making of its officers. Chicago is famously lauded as one of most diverse cities in the world—and also one of the most segregated along racial and ethnic lines. Yet, the CPD's training does nothing to effectively equip CPD officers with the knowledge and insight necessary to understand and protect communities that may look very different from their own. CPD lacks effective training related to implicit and explicit bias, cultural competency and awareness, procedural justice, ethics, community dignity, community perceptions of the police in Chicago, and the effect of racial and ethnic segregation on Chicago's communities. Effective training on these and other related 77 topics, when accompanied by concrete reforms to problematic policies and practices, has been found to reduce uses of force in other jurisdictions.

123. Training in the CPD Academy does not instill new recruits with adequate knowledge of constitutional policing. The Academy provides recruits with 1,000 hours of training on various topics but pays little attention as to whether the content is being effectively delivered or if the training matches recruits' needs. The DOJ noted that Academy training lacked detail and there was little attempt to engage recruits with the content of the lessons. One training supervisor described Academy training as "check

the box training, meaning that the emphasis is on making a record of having provided training as opposed to actually providing effective instruction."

124. Training materials are outdated and fail to integrate evolving legal standards or departmental policies. The DOJ noted that use of force trainings for officers relied on a video made 35 years ago, before several key Supreme Court decisions that changed the legal standards for evaluating the reasonableness of use of force.

125. Many recruits leave the Academy without learning key lessons needed to ensure constitutional policing. The DOJ asked several officers to articulate when a use of force would be justified. Only one out of six even came close to stating the proper standard.

126. Deficient training makes it impossible for the CPD to identify which recruits need further training and which recruits should be dismissed from the force because they are unable to police constitutionally or effectively. This is demonstrated by the fact that Academy attrition rates are close to zero, far below the average levels at police academies across the country.

127. Similar to training in the Academy, Field Training for recruits is also deficient. The DOJ investigation found that the CPD Field Training Program "actively undermines, rather than reinforces, constitutional policing."

128. CPD officials interviewed by the DOJ confirm the weaknesses of Field Training. Officials described the program as a "hot mess," "terrible," and simply "warm butts in seats."

129. The Field Training Program is understaffed. There are not enough Field Training Officers ("FTOs") to observe and provide instruction or to develop an effective rapport with officers in the field. While the CPD has a goal of having 150 available FTOs, the DOJ Findings Report estimates that the number of currently available FTOs is between 60 and 75. This understaffing leads to placing recruits on patrols without a FTO prior to the completion of the Field Training Program. The DOJ described this practice as "dangerous" and stated that it "demonstrates CPD's disregard of the training necessary for new officers to do their jobs safely, effectively, and lawfully."

130. Furthermore, relevant qualifications such as leadership, mentorship, and instructional skills are not considered when selecting new FTOs. An officer's disciplinary record will not bar an officer from being an FTO unless it resulted in a suspension of longer than seven days in the past year or if there were three or more suspensions in the past five years. Once FTOs are in place, they are never evaluated or held accountable for the success or failure of their training. There is neither regular auditing of the Field Training Program nor solicitation of feedback from recruits about what aspects of Field Training can be improved.

131. In-service training is similarly inadequate. After the Academy, officers are not required to participate in any annual live training. In-service training is only offered sporadically and consists largely of reactive trainings, videos, or e-learning online courses. The DOJ reported that one officer summed up the entire in-service training program as "Watch a Video." CPD supervisors also acknowledged to the DOJ that officers do not pay attention to the video or e-learning trainings and that they were generally ineffective.

132. There is no regular in-service training refreshing officers on important basic skills, such as when deadly force is justified. Officers reported to the DOJ that after they left the Academy they were never required to retrain on any basic skills: 80 "[I]nterviews were unanimous in their belief that the lack of continuing training has a direct connection to the improper use of force in patrol and other field assignments."

133. In-service training also fails to teach officers about changes in technology, the law, community expectation, Department policies, or national police practices.

134. The in-service training that is provided is ad-hoc, disorganized and reactive to the latest crisis. For example, when the CPD implemented training around Investigatory Stop Reports in order to resolve an ACLU lawsuit, officers found the training to be inconsistent, contradictory, and confusing. It focused on how to fill out the required forms but utterly failed to address the broader context of constitutional policing and how to effectively and lawfully conduct stops, searches, and arrests.

135. The CPD's Education and Training Division lacks the staff and resources to ensure that training is effective. The Division is understaffed, and instructors are not selected based on skills or qualifications. The physical space used for training is in disrepair. Training equipment is old and breaks frequently. The expert retained by the DOJ found the shooting range at the Academy to be "exceptionally substandard."

## Mr. Coleman's Damages

136. Mr. Coleman was subjected to police harassment, unfair criminal proceedings., civil rights violations and incarceration before he was finally given an certificate of innocence.

137. The emotional pain and suffering caused by being wrongfully incarcerated has been significant. As only a young 39- year old, Mr. Coleman was deprived of the everyday pleasures of basic human life; his freedom was taken from him. Since then, Mr. Coleman has had to live with a felony record he did not deserve.

138. As a result of the foregoing, Mr. Coleman has suffered emotional damages, irreparable harm all proximately caused by Defendant's' misconduct.

## Count I: 42 U.S.C. § 1983 – Due Process

139. Each paragraph of this Complaint is incorporated as if restated fully herein. In the manner described more fully above, Defendant Officers, while acting as investigators, individually, jointly, and in conspiracy with each other, deprived Plaintiff of his constitutional right to due process and a fair trial.

140. In the manner described more fully above, Defendant Officers deliberately withheld exculpatory evidence from Plaintiff and from state prosecutors, among others, as well as

knowingly fabricated false evidence, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

141. The constitutional injuries complained of herein were proximately caused by the intentional misconduct of Defendant Supervisory Officers or were proximately caused when Defendant Supervisory Officers were deliberately, recklessly indifferent to their subordinates' misconduct, knowing that turning a blind eye to that misconduct would necessarily violate Plaintiff's constitutional rights.

142 . In addition, Defendant Supervisory Officers themselves concealed exculpatory evidence from Mr. Coleman, specifically information about Watts's and his team's pattern of misconduct. In this way, Defendant Supervisory Officers violated Mr. Coleman due process right to a fair trial deliberately and with reckless disregard to Mr. Colemans rights.

143. Defendants' misconduct directly resulted in the unjust criminal conviction of Plaintiff, thereby denying his constitutional right to due process and a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued. Case: . The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and in total disregard of the truth and of Mr. Coleman's clear innocence.

145. Defendants' actions were taken under color of law and within the scope of their employment.

146 .The City of Chicago is also directly liable for the injuries described in this Count because the City and CPD maintained official policies and customs that were the moving force behind the violation of Plaintiff's rights and also because the actions of the final policymaking officials for Defendant City of Chicago and CPD were the moving force behind the violation of Plaintiff's rights.

147. .At all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendant City of Chicago maintained a system that violated the due process rights of criminal defendants like Mr. Coleman by concealing exculpatory evidence of Chicago police officers' patterns of misconduct.

148. In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendant City of Chicago had notice of a widespread practice by its officers and agents under which criminal suspects, such as Mr. Coleman , were routinely deprived of exculpatory evidence, were subjected to criminal proceedings based on false evidence, and were deprived of liberty without probable cause, such that individuals were routinely implicated in crimes to which Case: they had no connection and for which there was scant evidence to suggest that they were involved.

149..As a matter of both policy and practice, Defendant City directly encourages, and is thereby the moving force behind, the very type of misconduct at issue here by failing to adequately train, supervise, control, and discipline its police officers, such that its failure to do so manifests deliberate indifference. Defendant City's actions lead police officers in the City of Chicago to believe that their actions will never be scrutinized and, in that way, directly encourage further abuses such as those that Mr. Coleman endured.

150. The above-described widespread practices, which were so well-settled as to constitute the de facto policy of the City of Chicago, were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it. These widespread practices were allowed to flourish because Defendant City and the CPD declined to implement sufficient policies or training, even though the need for such policies and training was obvious. Defendant City and the CPD also declined to implement any legitimate mechanism for oversight or punishment of officers, thereby leading officers to believe that they could violate citizens' constitutional rights with impunity.

151. Furthermore, the misconduct described in this Complaint was undertaken pursuant to the policy and practices of Defendant City in that the constitutional violations committed against Plaintiff were committed with or  approval of persons with final policymaking authority for the City of Chicago and the CPD, or were actually committed by persons with such final policymaking authority.

152. Indeed, municipal policymakers have long been aware of Defendant City's policy and practice of failing to properly train, monitor, investigate, and discipline misconduct by its police officers, but have failed to take action to remedy the problem.

153. For example, at a City Council hearing on September 28, 1999, in response to two high-profile unjustified police shootings, Superintendent Terry Hillard noted the need for better in-service training on the use of force, early detection of potential problem officers, and officer accountability for the use of force.

154. In June 2000, the Chairman of the Committee on Police and Fire of the Chicago City Council submitted an official resolution recognizing that "[Chicago] police officers who do not carry out their responsibilities in a professional manner have ample reason to believe that they will not be held accountable, even in instances of egregious misconduct."

155. In 2001, the Justice Coalition of Greater Chicago ("JCGC"), a coalition of more than a hundred community groups, confirmed the findings of that resolution, concluding that the CPD lacked many of the basic tools necessary to identify, monitor, punish and prevent police misconduct. The JCGC findings were presented to Mayor Daley, Superintendent Hillard, and the Chicago Police Board. . Despite the municipal policymakers' knowledge of the City's failed policies and practices to adequately train, supervise, investigate, discipline, and control its police officers, nothing was done to remedy these problems.

156. As a result, the CPD has continued to respond to complaint of police misconduct inadequately and with undue delay, and to recommend discipline in a disproportionately small number of cases.

157. Indeed, by its own admissions, more than 99% of the time when a citizen complains that his or her civil rights were violated by police officers, the City sides with the police officer and concludes that no violation occurred.

158. Notably, Defendants MaHale and his team are not the first Chicago police officers who were allowed to abuse citizens with impunity over a period of years while the City turned a blind eye.

159. McHale, Defendant Officer in this case, had accumulated dozens of complaints over the years, which Defendant city routinely deemed unfounded or not sustained.

. In the case of Klipfel v. Bentsen, No. 94-cv-6415 (N.D. Ill), a federal jury found that, as of 1994, the CPD maintained a code of silence that facilitated misconduct committed by Mchale

Likewise, in the case of Obryka v. City of Chicago et al., No. 07 CV 2372 (N.D. Ill.) (the Abbate case), a jury found that as of February 2007 "the City [of Chicago] had a widespread custom and/or practice of failing to investigate and/or discipline its officers and/or code of silence."

The same constitutionally-defective oversight system in place during the time periods at issue in the Klipfel case and in the Obrycka case were also in place in 2006, when Mr. Coleman suffered the abuse described above.

125.The same code of silence in place at the CPD during the time periods at issue in the Klipfel case and in the Obryka case were also in place in 2006, when Mr. Coleman suffered the abuse describe above.

126. Indeed, the problems found to exist by the jury in Klipfel and Obrycka continue to this day. In December 2015, Mayor Rahm Emanuel acknowledged that a "code of silence" exists within the Chicago Police Department that encourages cover-ups of police misconduct, and that the City's attempts to deal with police abuse and corruption have never been adequate.

127.The policies, practices, and customs set forth above were the moving force behind the constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

128.Defendant City's investigation of complaints is characterized by unreasonably long delays, despite the relatively straight-forward nature of many misconduct claims. They go unheard. And are covered up.

129.Although Defendant City has long been aware that its supervision, training, and discipline of police officers is entirely inadequate, it has not enacted any substantive measures to address that deficiency.

130. Instead, Defendant City continues to inadequately investigate citizen complaints and take action against officers when necessary. It has also failed to modify its officer training programs to reduce misconduct against Chicago residents or to implement a system to identify and track repeat offenders, districts, or units.

131.Plaintiff's injuries were caused by officers, agents, and employees of Defendant City of Chicago and the CPD, including but not limited to the individually named Defendants, who acted pursuant to the policies, practices, and customs set forth above in engaging in the misconduct described in this Count. Count II: 42 U.S.C. § 1983 Malicious Prosecution and Unlawful Pretrial Detention.

132.Each paragraph of this Complaint is incorporated as if restated fully herein.

133. In the manner described more fully above, Defendants, while acting as investigators, individually, jointly, and in conspiracy with each other, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff

without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent.

134. In doing so, Defendants caused Plaintiff to be unreasonably seized without probable cause and deprived of his liberty, in violation of Plaintiff's rights secured by the Fourth and Fourteenth Amendments.

135. The false judicial proceedings against Plaintiff were instituted and continued maliciously, resulting in injury.

136. Defendants deprived Plaintiff of fair state criminal proceedings, including the chance to defend himself during those proceedings, resulting in a deprivation of liberty.

137. In addition, Defendants subjected Plaintiff to arbitrary governmental action that shocks the conscience in that Plaintiff was deliberately and intentionally framed for a crime of which he was totally innocent, through Defendants' fabrication and suppression of evidence.

138. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and in total disregard of the truth and of Plaintiff's clear innocence.

139. The Defendants' actions were taken under color of law and within the scope of their employment.

140 .As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

141. Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Chicago, and by Defendants who were final policymakers for Defendant City of Chicago, in the manner described more fully above. Count III: 42 U.S.C. § 1983 – Failure to Intervene

142 .Each paragraph of this Complaint is incorporated as if restated fully herein.

143. In the manner described more fully above, during the constitutional violations described herein, Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so. IA complaint 313-141 and many covered up complaints.

144. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and in total disregard of the truth and of Plaintiff's innocence.

145 .The Defendants' actions were taken under color of law and within the scope of their employment.

146. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

147. Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Chicago, and by Defendants who were final policymakers for Defendant City of Chicago, in the manner described more fully above. Count IV: 42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights

148. Each paragraph of this Complaint is incorporated as if restated fully herein.

149. Prior to Plaintiff's conviction, all of the Defendant Officers, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and thereby to deprive him of his constitutional rights, all as described above.

150. In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability by depriving Plaintiff of his rights. Case: # 06cr0757201

152. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and in total disregard of the truth and of Plaintiff's innocence.

153. The Defendants' actions were taken under color of law and within the scope of their employment.

154. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

155. Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Chicago, and by Defendants who were final policymakers for Defendant City of Chicago, in the manner described more fully above. Count V: Illinois Law – Malicious Prosecution

156. Each paragraph of this Complaint is incorporated as if restated fully herein.

157. In the manner described more fully above, Defendants accused Plaintiff of criminal activity and exerted influence to initiate, continue and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

158. In so doing, these Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury. Case: 06cr757201

159. The Defendants' actions were taken under color of law and within the scope of their employment.

160. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above. Count VI: Illinois Law – Intentional Infliction of Emotional Distress,

161. Each paragraph of this Complaint is incorporated as if restated fully herein.

162. The actions, omissions, and conduct of Defendant Officers, as set forth above, were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

163. The Defendants' actions were taken under color of law and within the scope of their employment.

164. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above. Count VII: Illinois Law – Civil Conspiracy

165. Each paragraph of this Complaint is incorporated as if restated fully herein.

166. As described more fully in the preceding paragraphs, Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement Case: 06cr0757201 among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of his rights. N case 06cro757201

167. In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

168. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and in total disregard of the truth and of Plaintiff's innocence.

169. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above. Count VIII: Illinois Law – Respondent Superior

170. Each paragraph of this Complaint is incorporated as if restated fully herein.

171. While committing the acts alleged in the preceding paragraphs, Defendant Officers were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

172. Defendant City of Chicago is liable as principal for all torts committed by their agents. Count IX: Illinois Law – Indemnification

173. Each paragraph of this Complaint is incorporated as if restated fully herein.

174. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment.

175. Defendant Officers were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiff Erick Coleman, respectfully request that this Court enter a judgment in his favor and against the City of Chicago, Rpbert Mchale the Chicago Police Department, States Attorney's Office, Agency Of the State Of Illinois and State of Illinois awarding compensatory damages, attorneys' fees and costs against the Defendant, punitive damages against the Defendants, and any other relief this Court deems just and appropriate. JURY DEMAND Plaintiff, Erick Coleman, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

_Erick B. Coleman_      8-17-2020

Erick B. Coleman
Without Prejudice UCC 1-201
nonresident / nondomestic
First Class U.S Delivery
c/o 276 E 140th Place
Dolton , Illinois

**FILED** KL

2/2/2021

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

21-CV-650
Judge Virginia M. Kendall
Magistrate Judge Beth W. Jantz

Erick B. Coleman

Without Prejudice UCC 1-201
nonresident/nondomestic

First Class U.S. Delivery

℅ 276 E 140th Place

Dolton, Illinois

United States District Court

Northern District of Illinois

219 S Dearborn St

Chicago, Illinois

RECEIVED

EC   FEB - 2 2021

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

Original Copy

Original Copy